# ORAL ARGUMENT HAS NOT BEEN SET

Appeal No. 14-5035

_____

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

DANITA M. WALKER,

Plaintiff-Appellant,

v.

JEH CHARLES JOHNSON, SECRETARY
U.S. Department of Homeland Security

Defendant-Appellee.

_____

On Appeal from the United States District Court
For The District of Columbia
Civil No. 1:11-cv-00816
**(The Honorable Rosemary M. Collyer)**

_____

# APPELLANT'S BRIEF

_____

David H. Shapiro
Richard L. Swick
Ellen K. Renaud
SWICK & SHAPIRO, P.C.
1101 15TH Street, N.W., Suite 205
Washington, DC 20005
Tel: (202) 842-0300
Email:  dhshapiro@swickandshapiro.com
    rlswick@swickandshapiro.com
    ekrenaud@swickandshapiro.com

Counsel for Appellant

## CORPORATE DISCLOSURE STATEMENT

In compliance with Federal Rule of Appellate Procedure 26.1 and local Rule 26.1, Appellant Danita M. Walker, makes the following disclosure stating that the following are all interested persons known to her:

1. Danita M. Walker, appellant, who is a natural person.

2. Ellen K. Renaud, attorney for the appellant, who is a natural person.

3. David H. Shapiro, attorney for the appellant, who is a natural person.

4. Richard L. Swick, attorney for the appellant, who is a natural person.

5. Jeh Charles Johnson, appellee, who is a natural person sued only in his capacity as the Secretary of the United States Department of Homeland Security.

6. Jane M. Lyons, Assistant United States Attorney, attorney for the appellee, who is a natural person.

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    LeRoy Becomes Walker's Supervisor and Learns of Her EEO
       Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   LeRoy Puts Walker on Leave Restriction Contrary to Her FMLA
       Approval for Emergency Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.    LeRoy Cites Walker's Approved Leave to Justify Her Low Rating . . . 6

V.     LeRoy Charges Walker AWOL Despite Approval of Her Leave . . . . . 7

VI.    LeRoy Issues a Reprimand Based on Unwarranted AWOL and
       False Allegation that Walker "Slammed" a Notice on His Desk . . . . . 8

VII.   LeRoy Charges Walker AWOL Despite Her Invocation and
       Approval for Unscheduled Emergency FMLA . . . . . . . . . . . . . . . . . 9

VIII.  LeRoy Makes It Impossible for Walker to Complete An
       Assignment, Then Threatens to Discipline Her For Not Following
       His Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IX.     LeRoy's Claim that He Did Not Promote Walker Because She
        Was Not "Referred" is Provably False . . . . . . . . . . . . . . . . . . . . . . . . . . 12

X.      LeRoy Thwarts Walker's Request for Worker's Compensation . . . . . 12

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.      Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.     The District Court Erred in Finding that Walker's AWOL Charges,
        Low Evaluation, and Letter of Reprimand Were Not Adverse
        Employment Actions.

        A.      A Jury Could Find that the Loss of Two Days' Pay is
                Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.      A Reasonable Jury Could Find Walker's Performance
                Rating Materially Adverse Because it Affected Her
                Performance Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        C.      A Reasonable Jury Could Find that Walker's Letter of
                Reprimand is an Adverse Employment Action . . . . . . . . . . . . . 22

III.    The Proximity Between Walker's EEO Mediation and the Beginning of
        LeRoy's Antagonism Raises An Inference of a Causal Link . . . . . . . . 23

IV.     Viewed in the Light Most Favorable To Walker, The Record Contains
        Evidence of Pretext, From Which a Jury Could Infer An Unlawful
        Racial Motive and/or Unlawful Retaliation . . . . . . . . . . . . . . . . . . . . . 24

        A.      A Reasonable Jury Could Reject LeRoy's Claim that He
                Never Intended to Curtail Walker's Ability to Care for
                Her Mother . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        B.      LeRoy's Conflicting Explanations for Each of His Actions Against

-ii-

**Walker, When Taken in their Totality, Suggest that He is Covering Up an Unlawful Motive** . . . . . . . . . . . . . . . . . . . . . . . . . **27**

    **1.**   **Two AWOL Charges** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

    **2.**   **2008 Performance Rating** . . . . . . . . . . . . . . . . . . . . . . . . **28**

    **3.**   **Letter of Reprimand** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

    **4.**   **Non-Selection** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

  **C.**   **The District Court's Focus on a Prima Facie Case of Race Discrimination Was Error** . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

# TABLE OF AUTHORITIES

**Statutes and Regulations:**

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291, 1294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 2000e-et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 C.F.R. § 9701.342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Cases:**

*Adickes v. S.H. Kress & Co.,*
   398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*Aka v. Washington Hosp. Center*,
   156 F.3d 1284 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Arrington v. United States*
   473 F.3d 329 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*\*Brady v. Office of Sergeant at Arms,*
   520 F.3d 490 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 28, 34-35

*Bridgeforth v. Jewell*,
   721 F.3d 661 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Celotex Corp v. Catrett,*
   477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Colbert v. Tapella*,
   649 F.3d 756 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Czekalski v. Peters,*
        475 F.3d 360 (D.C. Cir. 2007) ................................. 36-37

*Evans v. Sebelius,*
        716 F.3d 617 (D.C. Cir. 2013) ................................. 28, 29

*Fierros v. Texas Dep't of Health*
        274 F.3d 187 (5th Cir. 2001) ................................... 18

*Geleta v. Gray,*
        645 F.3d 408 (D.C. Cir. 2011) ................................... 29

*Ginger v. District of Columbia,*
        527 F.3d 1340 (D.C. Cir. 2008) ................................ 18

*George v. Leavitt,*
        407 F.3d 405 (D.C. Cir. 2005) ............................... 30, 35

*Greer v. Paulson,*
        505 F.3d 1306 (D.C. Cir. 2007) ................................ 18

*Hall v. Giant Food, Inc.,*
        175 F.3d 1074 (D.C. Cir. 1999) ................................ 30

*Hamilton v. Geithner,*
        666 F.3d 1344 (D.C. Cir. 2012) ................................ 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
        475 U.S. 574 (1986) ......................................... 17, 18

*Powell v. Lockhart,*
        629 F.Supp.2d 23 (D.D.C. 2009) ............................... 22

*Reeves v. Sanderson Plumbing,*
        530 U.S. 133 (2000) ......................................... 31-32

*Russell v. Principi,*
    257 F.3d 815 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Salazar v. Washington Metropolitan Transit Auth.,*
    401 F.3d 504 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Walker v. England,*
    590 F.Supp.2d 113 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Walker v. Johnson*,
    501 F.Supp.2d 156 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Washington Post Co. v. United States Dep't of Health & Human Srvs.,*
    865 F.2d 320 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Weber v. Battista,*
    494 F.3d 179 (D.C.Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*\* Denotes case upon which Appellant chiefly relies.*

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* This Court has jurisdiction to review the final judgment of the district court pursuant to 28 U.S.C. §§ 1291, 1294.

## STATEMENT OF THE ISSUES

1.     On summary judgment, may the court credit a selecting official's assertion that he did not receive a referral list that included the plaintiff where there is an official document from the Office of Personnel Management indicating that the plaintiff's application was referred to the selecting official?

2.     Whether a reasonable jury could reject a manager's claim that he charged an employee as AWOL because she did not receive approval from her second-level supervisor where an Acting Supervisor with authority to approve her leave had given her the approval to take the leave.

3.     Is an employee required to show that a higher performance rating would have automatically entitled her to a performance bonus in order for a reasonable jury to find that her low performance rating constituted an adverse employment action or is it sufficient that the Agency's policy indicates that a performance award is expected for employees rated higher than the employee was rated?

4.     May a jury infer pretext where a manager justifies his rating of an employee

with the employee's use of approved leave where the Agency's policy prohibits managers from reducing ratings based on such usage?

5.      Is a Letter of Reprimand that remains in an employee's personnel file for two years, with the intent of considering the reprimand as prior discipline, an adverse employment action?

6.      Can a reasonable jury conclude that a manager influenced the decision of a panel to issue a letter of reprimand to an employee where the manager recommended the discipline, provided input into the decision, and the employee was not permitted to give any input to the panel whatsoever?

7.      Whether a reasonable jury could infer a connection between an employee's EEO complaint and an adverse action where antagonism begins less than two months after an EEO mediation session and where the manager thereafter displayed contempt for the employee by (a) an incredible insensitivity to her need to use FMLA-approved leave during medical emergencies; (b) falsely stating that the employee "slammed" a leave slip on his desk while she was having an asthma attack; (c) improperly lowering her evaluation based on her use of approved sick leave; (d) charging her AWOL and referring her for discipline for taking leave approved by her Acting Supervisor; and (e) charging her AWOL for failing to continuously make phone calls until she reached a live supervisor to request leave while she cleaned her disoriented and soiled mother in a smoke-filled apartment,

2

even though she had left a voicemail and an email during these emergency
situations.

8.    Whether a reasonable jury could reject a manager's claim that he did not
intend to interfere with an employee's need to take leave to care for her mother and
that the punishment for her use of leave was necessary to insure that she was
available for assignments where the supervisor cannot point to a single instance
where the employee failed to carry out an assignment in a timely and satisfactory
manner.

## STATEMENT OF THE CASE

Plaintiff-Appellant, Danita Walker, filed her initial complaint against
Defendant-Appellee on May 2, 2011. R. 1.  Ms. Walker contended that the Agency
discriminated against her and retaliated against her by putting her on leave
restriction, charging her as Absent Without Leave, downgrading her performance
based on approved sick leave, issuing her a letter of reprimand, and rejecting her
application for promotion to a Grade 13 position.  Defendant moved for summary
judgment on April 22, 2013.  R. 18.  The district court granted that motion and
entered judgment for defendant on December 20, 2013. R. 25; R. 26. Walker timely
filed her Notice of Appeal on February 4, 2014.  R. 27.

3

**STATEMENT OF THE FACTS**

## I.  Background.

Danita Walker worked as a Grade 12 Management and Program Analyst with DHS - Immigration and Customs Enforcement (ICE) in the Office of Detention and Removal Operations (DRO) in the Bond Management Unit. R.22, Ex. 23. Walker's supervisors expressed satisfaction with her work and frequently rewarded her performance. R.22, Ex.1 at No. 3, Ex.'s 24 and 25; R. 18, Ex.14 at 1 ("Ms. Walker is a vital part of the DRO Bond Management Team and is always willing to assist fellow employees."). She completed her assignments timely and often volunteered to help others. R.22, Ex.10 at 37-38; R.22, Ex.1 at No. 3.

## II.  LeRoy Becomes Walker's Supervisor and Learns of Her EEO Activity.

In March 2008, Walter LeRoy was hired as Walker's supervisor. From the beginning, he appeared uncomfortable working with Walker, his only black subordinate. R.22, Ex.10 at 43-44. He was nasty and antagonistic toward her and intentionally made her work difficult, but was professional and nice to his other staff. *Id.* at 44-50; R.22, Ex.8 at 116-17. Her very presence annoyed him. R.22, Ex.8 at 117. When LeRoy was hired, Dan Wells, the subject of Walker's earlier EEO complaint, told LeRoy that he had "issues" with Walker. R.22, Ex.9 at 148. On April 28, LeRoy learned that these were EEO issues because Walker requested leave to attend mediation on her EEO case against Wells. R. 18, Ex.29.

4

### III.   LeRoy Puts Walker on Leave Restriction Contrary to Her FMLA Approval for Emergency Leave.

During the first half of 2008, Walker had to care for her mother who was suffering from Alzheimer's disease. Walker made LeRoy aware of her mother's situation and requested FMLA.  On June 16, Walker's request for emergency, intermittent FMLA was approved. R. 18, Ex.28. Yet, on June 25, LeRoy put Walker on "leave restriction." R. 18, Ex.6.

The "leave restriction" required Walker to contact LeRoy by telephone or leave a voice message "by 9:30 a.m. on the day of the emergency."  R. 18, Ex.6 at 2. If she was unable to make "voice to voice" contact with him, he required her to make "voice to voice" contact with her second level supervisor by telephone. *Id.*[1] If she could not make contact with him, LeRoy required "voice to voice" with her third-level supervisor. *Id.*

This three-phone-call procedure was directly contrary to Ms. Walker's authorization under the FMLA to take unscheduled and intermittent leave to care for her mother.  Even LeRoy's leave restriction letter provides that "[i]f the need for [FMLA] leave is not foreseeable, you must provide notice within a *reasonable* period of time appropriate to the circumstances involved."  R. 18, Ex.6 at 3.

---

[1]LeRoy testified that e-mail was sufficient notice, yet in practice, he enforced his three-phone call, "voice to voice" procedure by charging her as Absent Without Leave when she was unable to follow it strictly. R.22, Ex.9 at 83-84.

Furthermore, Walker explained to LeRoy that, "because of my Mother's condition, and coordination with my siblings, there will be times when I will not be able to provide prior notice that I will need to use leave to care for her."  R.22, Ex.2.

LeRoy contends that he put Walker on "leave restriction" because her use of leave "pose[d] a problem for the efficiency of the Bond Management Unit." R. 18, Ex.6. Yet, he had never before told Walker that her leave was a problem or that she used too much. R.22, Ex.8 at 70-71; R.22, Ex.1 at No. 1. And, although LeRoy states that her attendance made it difficult to assign her work, he has not identified a single occasion when she was unavailable for a work assignment.

LeRoy did not put any of his other subordinates – all of whom are outside Walker's protected classes – on leave restriction. R.22, Ex.9 at 75. He allowed Allen Kline, a white male, to use FMLA to care for his father and never put him on leave restriction or charged him as AWOL. R.22, Ex.8 at 72; R. 18, Ex.25 at 4.

## IV.    LeRoy Cites Walker's Approved Leave to Justify Her Low Rating.

During the 2007-2008 performance period, LeRoy told Walker that he was satisfied with the quality of her work, and had no criticisms. R.22, Ex.1 at No.3. Walker completed all of her assignments on time and volunteered to perform work within her unit and in other units. R.22, Ex.8 at 132. She went out of her way, above and beyond her requirements, to be supportive and to assist everyone she could. *Id.* at 165. Yet, LeRoy rated Ms. Walker on her 2008 performance appraisal

as "Achieved Expectations," the second-lowest available rating. R.22, Ex.4.[2] His

criticism of Walker related mainly to her approved absences. See R.22, Ex.1 at

No.3. He did so knowing that all of her absences were approved, R.22, Ex.4; R. 18,

Ex.2 at ¶ 13; R.22, Ex.4, and that  DHS policy prohibited him from reducing a

rating based on taking approved leave. R.22, Ex.5 at 20 ("DHS management

officials may not lower the rating of record of an employee because of an approved

absence from work."). He also caused her to lose a cash award. DHS

"[p]erformance awards . . . are linked directly to the annual performance appraisal,"

R.22, Ex.7, and are only available to employees rated "Achieved Excellence" and

"Exceeded Expectations."  R.22, Ex.6 at 2.

## V.    LeRoy Charges Walker AWOL Despite Approval of Her Leave.

Despite Walker's documented and FMLA-approved need for unscheduled

emergency leave to care for her mother, LeRoy enforced his draconian leave-

requesting procedure to the letter. He went so far as to charge Walker AWOL for

leave when she had obtained approval by the supervisor that he had designated to

act for him while he was on leave and unreachable. R.22, Ex.8 at 84-85.  On

October 22, 2008, LeRoy designated Carl Albritton to act as Unit Chief without

---

[2]LeRoy rated a total of four employees for 2008.  One was given the highest rating (Outstanding) and two were rated at the second highest level (Achieving Excellence).  R.18-2 at 67, ¶ 18.  Only Ms. Walker received the second to lowest rating and thus only Ms. Walker was ineligible for a performance award (Achieved Expectations).  R.18-3.

restrictions on his authority. *Id.* at 88. Similarly, when Walker was on detail to

another unit, LeRoy instructed her to telephone the supervisor of that unit. R.22,

Ex.9 at 92-93. So, when Walker was sick on October 22, 2008, she contacted

Albritton--by telephone as required--to request leave. R.22, Ex.8 at 84, 179.

Walker also left LeRoy a voicemail. *Id.* at 88. Albritton approved the leave, but

LeRoy crossed out Albritton's signature approving the leave and changed it to

AWOL. R. 18, Ex.9. LeRoy claimed that he told Albritton he was not to handle

personnel issues while acting as unit chief. R.22, Ex.11 at 4. *But see* R.22, Ex.1 at

No. 2 (Mr. Albritton was designated acting unit chief for that period and "not given

any restrictions or instructions regarding any of the employees within the unit.").

## VI.   LeRoy Issues a Reprimand Based on Unwarranted AWOL and False Allegation that Walker "Slammed" a Notice on His Desk.

On February 2, 2009, LeRoy issued Walker a letter of reprimand. R. 18,

Ex.10. On October 28, 2008, Walker had an asthma attack while at work. R.22,

Ex.12 at 7; R.22, Ex.8 at 171. She called her doctor for a prescription, but he

advised her to go straight to the emergency room. R.22, Ex.8 at 171-72. At that

point, she was barely able to speak to LeRoy because of her irregular breathing.

R.22, Ex.8 at 172; R.22, Ex.1 at 16. She sent LeRoy an email informing him of her

attack and brought him a leave form. R.22, Ex.8 at 172. He was sitting in a small

cubicle with three other men. *Id.* To put the form in LeRoy's box, Walker leaned

between the four men, excusing herself; while leaning on one leg and holding her

suit jacket to her chest, trying not to get "uncomfortably close to anyone," she placed the form in LeRoy's in box and left. R.22, Ex.1 at 16. After giving LeRoy the slip, Walker got her coat and went to the emergency room. R.22, Ex.8 at 174.

LeRoy issued Walker a Letter of Reprimand for "unprofessionalism" during her asthma attack. In the Reprimand, he falsely wrote that Walker "tossed, with emphasis, [her] leave form in [his] inbox and left the area without saying any other words."  R. 18, Ex.10 at 1. At his deposition, LeRoy claimed that Walker "slammed" the form on his desk and that all the witnesses agreed that she had "slammed" it. R.22, Ex.9 at 107-08. *But see* R.18, Ex.15 at 2 (witness email stating that Walker "drop[ped] a paper on Mr. Leroy's desk."); *id.* at 3 (witness email stating that Walker "tossed (with emphasis) her leave form in Mr. LeRoy's basket"); *id.* at 4 (witness email stating that Walker "swiftly placed a leave slip in the in box"). Then, in his April 2013 declaration, he alleges for the first time that Walker spoke loudly when she said "excuse me."  R. 18, Ex.2 at ¶ 11.

## VII.   LeRoy Charges Walker AWOL Despite Her Invocation and Approval for Unscheduled Emergency FMLA.

LeRoy admitted that in certain emergency circumstances, failure to follow the strict dictates of the leave restriction would *not* warrant an AWOL charge. He admitted that reasonable notice was a judgment call, dependent on the circumstances. Yet, twice when Walker told him she had to attend to her mother, he failed to obtain the circumstances and simply charged her AWOL. R.22, Ex.12

9

at ¶¶ 8 - 10. First, when Walker found her mother in an apartment full of smoke and feces with her day clothes on inside out over her bed clothes and a cup of tea, aluminum foil and a spoon in the microwave, LeRoy charged her as AWOL without allowing her to explain the circumstances. *Id*. LeRoy charged Walker as AWOL because she did not call her second level supervisor after leaving him a voicemail and an email. R. 18, Ex.13; R. 18, Ex.2 (LeRoy Decl.) at ¶ 12 (admitting Walker left a voicemail and email indicating she was attending to her mother).

LeRoy also did not allow Walker to explain the situation on March 4, 2009, when she left him a voicemail stating she needed to care for her mother. R.22, Ex.12 at ¶¶ 8 - 10. Had she been given the opportunity, he would have learned:

> I was unable to continue to dial the phone in an effort to reach other alternative supervisory staff members because the condition in which I found my mother required my immediate physical attention: she had unknowingly taken the telephone off the hook, defecated and urinated on herself, and was standing in the bathroom completely naked, wiping her hand on the walls because she did not know what to do.

*Id.* at ¶ 8. Walker called LeRoy a second time after she bathed her mother and had her sitting in a towel, but he did not answer. *Id.* at ¶ 9. She left him a voicemail, but could not continue to call because she had to clean her mother's bedroom, change the linens, clean the carpet and wash her clothes. *Id.* at ¶ 10.

## VIII.  LeRoy Makes It Impossible for Walker to Complete An Assignment, Then Threatens to Discipline Her For Not Following His Instructions.

In March 2009, LeRoy was assigned to respond to technical questions and

review a Business Impact Analysis (BIA). R.22, Ex.9 at 110. The original due date

for the assignment was March 27. R.22, Ex.16 at 3. The requesting office (Rick

Pulsinelli) noted that LeRoy's unit was the only unit that did not have a

representative on the BIA team and had not provided input; he asked that they do

so by Tuesday, March 31. *Id.* at 2.  At the time, LeRoy thought "BIA" stood for

Board of Immigration Appeals and did not know what the assignment was about.

R.22, Ex.9 at 110, 115. Yet, he assigned this task to Walker–whom he claimed to

be his least able subordinate. R.22, Ex.9 at 34, 37, 112-13. LeRoy then made the

assignment as difficult as possible, if not impossible. Although there were only

three days until it was due – and he had no idea how hard it would be – he told

Walker to get it in early. R.22, Ex.16. Then, the morning it was due, she sent him a

draft of the assignment, but he did not read it. R.22, Ex.1 at 21. Instead, at 2:22

p.m. on March 31, knowing that it was due that day, he told her to get input from

coworkers. R.22, Ex.19 at 1-2. Walker warned him they might miss the deadline,

but he said he could not look at the one and one-half page draft because he had

"more important things to do." *Id.* at 22; R.22, Ex.18 (LeRoy was "too busy" to

discuss it). Meanwhile, Pulsinelli pressed Walker to finish the paragraphs "right

away." *Id.* To meet the deadline, Walker sent the BIA to Pulsinelli at 4:27 p.m. on

March 31, 2009. R.22, Ex.17. For this, LeRoy threatened Walker with disciplinary

action because he had not reviewed the assignment. R.22, Ex.9 at 116 (admitting

that Walker successfully learned what needed to be done, completed the

assignment timely and her finished product was acceptable).

## IX.    LeRoy's Claim that He Did Not Promote Walker Because She Was Not "Referred" is Provably False.

Walker was certified as qualified for a GS-13 MPA position but was not

interviewed. Walker was not certified for the position at the GS-14 level, R. 18,

Ex.20.  However, OPM documents show that she was referred at the GS-13 level.

R.22, Ex.15. A letter from OPM to Walker indicates that Walker was "referred" to

the selecting official under Referral Name: PH-09-JCS-05880S0."  R.22, Ex.15 at

2-3. Instead of selecting Walker, LeRoy falsely claimed that she was not referred to

him. R.22, Ex.9 at 46. He then selected Melinda Jones, a white female who had not

accused the Agency of discrimination. R.22, Ex.8 at 157. Jones had no experience

with immigration or bonds. R.22, Ex.9 at 44-45. Walker, a GS-12, had to teach

Jones, a GS-14, how to do her job. R.22, Ex.8 at 161.

## X.    LeRoy Thwarts Walker's Request for Worker's Compensation.

 In November 2009, Walker applied for worker's compensation because her

doctor recommended she take time off and have no contact with the Agency due to

work-induced depression and anxiety. R.22, Ex.8 at 94, Ex.9 at 127-28. LeRoy

attached a note to her worker's compensation application stating he had never

witnessed anything to show that Walker had a work-related injury. R.22, Ex.9 at

127. Walker had told LeRoy of her work-related stress and he saw medical records

12

confirming she had a stress-induced asthma attack.  *Id.* at 103.

## SUMMARY OF ARGUMENT

In March 2008, Walter LeRoy, a white male, became the supervisor of Danita Walker, an African-American employee of the Immigration and Customs Enforcement ("ICE") agency which is part of the U.S. Department of Homeland Security.  LeRoy heard from his predecessor that he had had issues with Ms. Walker, and within a month he found out that the issues were her EEO activity.

At the very outset, Ms. Walker noticed that he treated her differently from his white subordinates.  These differences were minor at first, but by June LeRoy began to frustrate Walker's ability to use her approved FMLA leave.  He implemented a draconian leave restriction policy that was so unreasonable she could not possibly follow it to the letter as he required and still care for her mother.  As a result, he was able to charge her as AWOL twice, despite her best efforts to comply, issue her a Letter of Reprimand, and downgrade her performance appraisal based on her leave usage.  And when she applied for a promotion, he decided to fill the position at the Grade 14 level, even though the position was posted for either the 13 or 14 level.

As in many cases involving an unlawful motive, the heart of Ms. Walker's case is the evidence raising an inference of pretext.  First, a reasonable jury could conclude that LeRoy was less than honest in describing Walker's alleged

misconduct.  Initially, he claimed that Walker was rude because she "tossed with emphasis" her leave slip while she was having an asthma attack.  That reason later evolved into him accusing her of "slamming" her leave slip on his desk and raising her voice to him.  In addition to his own internal contradictions about this action, neither Walker nor any of the three witnesses to this incident state that she slammed the paper or raised her voice–despite LeRoy's claim that all three witnesses would corroborate his claim.  A reasonable jury weighing the evidence could thus credit Walker's testimony that she placed the paper on his desk and spoke in a low voice, and find that LeRoy invented his allegations to cover up his unlawful motives for taking action against her.

Second, LeRoy charged Walker as AWOL even when she did follow the leave restriction procedures.  Rather than acknowledging her efforts to follow his procedures despite her mother's emergency condition, he found a way to interpret his restrictions so that he could find Walker's voice messages and email messages insufficient and unreasonable even though Walker was occupied with cleaning her mother's apartment and body from feces and smoke resulting from dangerous use of the microwave oven. On another occasion, he claimed that her voice-to-voice contact with his designated acting Unit Chief was insufficient.  He claimed that he told the acting supervisor that he did not have authority to approve leave, but the acting supervisor denied that he said this.  Thus, a reasonable jury could conclude

14

that LeRoy is being dishonest about his instructions to hide his discriminatory and retaliatory motives.

In addition to frustrating her ability to take her approved FMLA emergency leave, LeRoy also sabotaged Walker's completion of her assignment, while claiming in her performance evaluation that he downgraded her because she was not available for assignments.

Fourth, there is evidence upon which a reasonable jury could conclude that LeRoy falsely claimed that he never received a Certificate of Eligibles for promotion with Ms. Walker's name on it. The Office of Personnel Management sent Ms. Walker a letter clearly indicating that she was referred to LeRoy for selection while LeRoy claims that Human Resources did not send him that list because they, not him, decided to restrict the selection pool to Grade 13 candidates. DHS has not produced any testimony or documentary evidence of this alleged decision, other than LeRoy's testimony. Based on the lack of support for his claim, and the other evidence of LeRoy's dishonesty, a reasonable jury could conclude that LeRoy's explanation is a pretext for his discriminatory and retaliatory reasons for not selecting Walker for the position.

In addition this ample evidence of pretext, a reasonable jury could also consider the unreasonableness of LeRoy's handling of Walker's need to care for her mother and reject as insincere his claim that he never intended to curtail her ability

15

to care for her mother given his draconian enforcement of his three-phone call process for leave requests. Although the district court discounted this evidence, a reasonable jury could consider it along with all the other evidence of LeRoy's dissembling and find that he is not credible.

For these reasons, the District Court's dismissal of Ms. Walker's claims at summary judgment should be reversed.

## ARGUMENT

### I.    Standard of Review.

Summary judgment is proper only against "a party who fails to make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party will bear the burden of proof at trial." Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986). This Court reviews the District Court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences accordingly. *Salazar v. Washington Metropolitan Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005) (internal citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the

16

absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323

(internal citations omitted).  In determining whether a reasonable trier of fact could

find for the nonmovant, the court must consider all of the evidence in the light

most favorable to the nonmovant, and draw all reasonable inferences in his or her

favor.  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008);

*Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).  In *Anderson v.*

*Liberty Lobby, Inc.*, the Supreme Court made clear that disputes over facts, which

might affect the outcome of the suit under the governing law, will preclude the

entry of summary judgment.  477 U.S. 242, 248 (1986); *see Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that where

the record taken as a whole could lead a rational trier of fact to find for the

nonmoving party, a motion for summary judgment cannot be granted).

It is axiomatic that the evidence presented must always be construed in favor

of the party opposing the motion for summary judgment, and it is that party who is

also to be accorded the benefit of all favorable inferences that can be drawn from

the record evidence.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see*

*also Washington Post Co. v. United States Dep't of Health and Human Srvs.*, 865

F.2d 320, 325 (D.C. Cir. 1989).  "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge." *Anderson*, 477 U.S. at 255.  Where the record

17

taken as a whole could lead a rational trier of fact to find for the nonmoving party,

a district court's decision to grant summary judgment must be reversed.

*Matsushita*, 475 U.S. at 587.

## II.    The District Court Erred in Finding that Walker's AWOL Charges, Low Evaluation, and Letter of Reprimand Were Not Adverse Employment Actions.

### A.    A Jury Could Find that the Loss of Two Days' Pay is Material.

As the D.C. Circuit has made clear, "a nontrivial loss of pay is an

'objectively tangible harm.'" *Ginger v. District of Columbia*, 527 F.3d 1340,

1343-44 (D.C. Cir. 2008). As an example of a "nontrivial" loss, the Court in

*Ginger* cited *Russell v. Principi*, 257 F.3d 815, 818-19 (D.C. Cir. 2001), where the

employee lost $548. *Cf. Greer v. Paulson*, 505 F.3d 1306, 1317 (D.C. Cir. 2007)

(AWOL charge resulting in "a diminution in pay" constitutes adverse action);

*Fierros v. Texas Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001) (denial of

"$57-per-month pay increase is not, as [defendant] claims, "de minimis."). Walker

was charged AWOL for 18 hours and thus suffered a loss of approximately $804.

R.22, Ex.21. Because this loss is "nontrivial," Walker has met the adverse action

element of her prima facie case. *See Russell*, 257 F.3d at 817 (adverse action where

employee who was rated "excellent," received a bonus of $807, while comparator

was rated "outstanding" and received $1,355).

18

**B.    A Reasonable Jury Could Find Walker's Performance Rating
Materially Adverse Because it Affected Her Performance Award.**

The Department's Awards Management Handbook states that "Performance

awards . . . are linked directly to the annual performance appraisal." R.22, Ex.7; *see*

*also* R. 22, Ex. 5 (DHS MD Number 3181: Performance Management) at 22

("Ratings of record shall be used as a basis for determining whether to grant a

performance award under 5 U.S.C. Chapter 45 and 5 C.F.R. part 45 consistent with

DHS MDs and policies."). Because LeRoy downgraded Walker's rating based on

her use of leave, she was ineligible to receive a performance award. R.22, Ex.6

(DHS Management Directive) at 2. Had she received a higher rating, she would

have received a performance award of at least one percent of her salary, or

$906.98. *Id.* Because "the loss of a bonus that is worth hundreds of dollars is not a

petty detriment," Walker's claim that she received a lowered performance rating

that caused her to lose a bonus is actionable. *Russell*, 257 F.3d at 819; *see also*

*Weber v. Battista,* 494 F.3d 179, 185-86 (D.C.Cir. 2007) (evaluations were

"adverse actions insofar as they resulted in her losing a financial award or an award

of leave").

The district court found, however, that because the monetary award did not

"almost automatically flow[] from a particular rating," she did not establish that her

lowered performance rating was an adverse employment action.  R. 25 at 25.  For

19

this proposition, the court overstates the holding of *Bridgeforth v. Jewell*, 721 F.3d

661 (D.C. Cir. 2013).  In *Bridgeforth*, the employee complained that his manager

did not nominate him for an award.  *Id.*  This Court held that the failure to

nominate was not an adverse employment action because the path from the

standards for the award were highly subjective and has to be passed upon through

several layers of his chain of command.  *Id.* at 664.  Bridgeforth "failed to produce

any evidence that would establish a direct and non-speculative connection between

action, nomination and award."  *Id.* at 664-65.

   In contrast, the record demonstrates that there is a direct connection between

the performance rating of a DHS employee and a performance award.  First, the

Awards Program Handbook for the Agency says so explicitly: "Performance

awards . . . are linked directly to the annual performance appraisal."  R. 22-7 at 2.

Nominations are submitted "within 30 calendar days from the approval date of the

rating of record."  R. 22-7 at 3. The CFO's Awards Guidelines from 2007 also

provide that "it is *expected* that these awards will be given to roughly the top 25-30

percent highest sustained performers in an office or group."  R.22-6 at 2.  The

guidelines provide further for a range of percentages that a manager should award

to an employee based on his or her rating.  *Id.*  For example, an employee who is

rated "Excellent," a manager has discretion to award between one and two percent

of basic pay.  *Id.*  Furthermore, federal regulations governing the Department of

Homeland Security provide a precise formula for determining performance pay increases that is "directly linked to the employee's rating of record." 5 C.F.R. § 9701.342 (a)(1). Employees are assigned performance points based solely on their performance rating: 4 performance points for the highest rating, 2 points for the second highest rating, 1 for the third highest rating and 0 for an unacceptable rating. 5 C.F.R. § 9701.342 (c)(1). Those points are then multiplied by a number that DHS has determined is a point value. 5 C.F.R. § 9701.342 (d)(2) (providing that performance payouts are a product of an individual's performance points and the point value). Thus, while there is language in the record that supports a finding that an award is not automatically given based on a rating, there is also support for a finding that an award is "directly linked" and "expected" and thus far from speculative. Accordingly, it is for the jury to determine whether, based on the documentary evidence, a DHS employee rated as Exceeds Expectations would receive a cash award.

**C.  A Reasonable Jury Could Find that Walker's Letter of Reprimand is an Adverse Employment Action.**

Where a letter of reprimand remains in a federal employee's official personnel file for two years, "adding a level of severity to any future discipline that might occur in that time frame, it cannot be said that such a reprimand would be immaterial." *Walker v. Johnson*, 501F.Supp.2d 156, 173 (D.D.C. 2007); *see* R. 18, Ex.10 at 2 (Official Letter of Reprimand to Walker indicating "This reprimand will be placed in your Official Personnel File (OPF) for a period of two years, during which it may be cited as a prior formal disciplinary action in any future disciplinary matter."). In *Walker v. Johnson*, the district court held that a letter of reprimand could be sufficient to dissuade an objectively reasonable employee from participating in EEO activities because the letter would remain in the plaintiff's OPF for two years. 501 F.Supp.2d at 173. Similarly, the court in *Powell v. Lockhart*, held that a letter of reprimand was actionable because it contained "questionable allegations of hostile and erratic workplace behavior" and would remain in the plaintiff's personnel file for one year. 629 F.Supp.2d 23, 40 (D.D.C. 2009). Walker's reprimand contained questionable allegations of hostility and remained in her file for two years. R. 18, Ex.10 at 2. Thus, it was sufficiently adverse to deter a reasonable employee from engaging in protected activity.

22

### III. The Proximity Between Walker's EEO Mediation and the Beginning of LeRoy's Antagonism Raises An Inference of a Causal Link.

In *Hamilton v. Geithner*, the D.C. Circuit held that temporal proximity could be measured as the time between protected activity and a manager's first step toward an adverse action. 666 F.3d 1344, 1358 (D.C. Cir. 2012). Here, there was less than a two-month lapse between protected activity and LeRoy's first step toward a series of adverse actions. On April 28, 2008, LeRoy first learned that Walker had filed an EEO case because she requested administrative leave for the mediation. R. 18, Ex.29. Less than two months later, LeRoy put Walker on leave restriction--his first step towards his campaign against Walker's use of unscheduled leave--leave that he knew she needed in order to care for her mother. R. 18, Ex.10.[3] This "pattern of antagonism," beginning so soon after learning of Walker's EEO activity, raises an inference of causation. *Walker v. England*, 590 F.Supp.2d 113, 140 (D.D.C. 2008).

---

[3]The evidence suggests that LeRoy acted against Walker even earlier as he had to meet with his senior management and consult with human resources before drafting the letter. R. 18, Ex.2 at ¶ 6.

**IV.    Viewed in the Light Most Favorable To Walker, The Record Contains Evidence of Pretext, From Which a Jury Could Infer An Unlawful Racial Motive and/or Unlawful Retaliation.**

**A.      A Reasonable Jury Could Reject LeRoy's Claim that He Never Intended to Curtail Walker's Ability to Care for Her Mother.**

LeRoy put Walker on leave restriction, requiring that "[a]ll absences from duty should be planned, requested and approved in advance."  R. 18, Ex.6 at 1. LeRoy provided no exceptions for emergencies. R. 18, Ex.6. Indeed, the letter sets out a time-consuming and cumbersome procedure for requesting approval that requires Walker to make up to three phone calls during any emergency situation and to start making those calls before 9:30 a.m. *Id.* In his recent declaration, LeRoy reiterates that the point of the leave restriction was to ensure that "any leave taken was planned, requested and approved in advance."  R. 18, Ex.2 at ¶ 7. These requirements are contrary to Walker's approval for intermittent *unscheduled* leave. R. 18, Ex.6 at 4 ("If the need for [FMLA] leave is not foreseeable, you must provide notice within a reasonable period of time appropriate to the circumstances involved."); *see also* R.22, Ex.2 ("because of my Mother's condition, and coordination with my siblings, there will be times when I will not be able to provide prior notice that I will need to use leave to care for her.").

LeRoy says that he had no intent "to curtail her ability to take leave to which she was entitled or interfere in her ability to care for her mother."  R. 18, Ex.2 at ¶

7.  LeRoy's severe treatment of Walker with regard to her need to care for her mother, along with his false explanations for several of the actions he took against her, support a jury finding that his claim of innocent motive unworthy of credence. If LeRoy did not intend to curtail Walker's ability to take leave to which she was entitled, why would he punish her when she was not able to satisfy requirements that were more strict than what was provided under the FMLA?  Not only did his restriction limit her ability to attend to emergencies with her mother, he caused her to lose pay by charging her AWOL, even when she had notified him of her need for emergency leave in accordance with the requirements for emergency leave in his leave restriction letter. Thus, a reasonable jury could reject his claim that he never intended to curtail her as leave to be unworthy of credence.

LeRoy's mendacity also supports a jury finding of retaliatory and discriminatory motive. LeRoy did everything he could to frustrate Walker's ability to take emergency leave and to punish her when she did. He refused to accept email or voicemail notification during emergencies.  He could not possibly expect Walker to attend to her mother's disheartening situation while at the same time making multiple phone calls and leaving messages with two or more supervisors. When she made her best efforts to notify him with emails and voicemails while she was trying to keep her mother calm and clean her up, he took no consideration of the circumstances and charged her AWOL. Even when she made contact with his

25

acting supervisor, Albritton, and he approved the absence, LeRoy falsely[4] claimed

that he had not authorized the acting supervisor to approve her leave and punished

Walker with another AWOL charge. Finally, LeRoy's decision to seek a

suspension on top of the reprimand and two AWOL charges bespeaks an animus

on the part of LeRoy that is unexplainable without reference to Walker's on-going

EEO complaints against him.

      A jury also could infer that LeRoy harbored a discriminatory or retaliatory

animus against Walker because he sabotaged her efforts to complete her

assignments.  He gave her an assignment and refused to look at her short draft.

Then he blamed her when she submitted it on time, but without his review.

      His final act of retaliation and discrimination against Walker was an attempt

to undermine her application for worker's compensation. For no reason at all, he

submitted a statement to the worker's compensation office in opposition to her

application, falsely claiming he had no reason to believe she suffered a work-

related illness, even though he had reviewed medical records that stated as much.

      In short, LeRoy actively sought to frustrate Walker's ability to care for her

ailing mother and to punish her any way he could. Yet, he allowed Allen Kline, a

white male who did not engage in EEO activity, to take extended leave to care for

---

[4]A reasonable jury could find that LeRoy's testimony on this point is false
based on Albritton's testimony that LeRoy did not restrict his authority.

his father. R. 18, Ex.25 at 4. LeRoy never claimed that Kline's absence hurt the

"efficiency of ICE operations," charged him AWOL, or lowered his rating.  A

reasonable jury could find that this disparate treatment was due to Walker's race or

her protected activity.

### B. LeRoy's Conflicting Explanations for Each of His Actions Against Walker, When Taken in their Totality, Suggest that He is Covering Up an Unlawful Motive.

#### 1. Two AWOL Charges.

First, LeRoy claims he charged Walker AWOL on October 22, 2008, and

February 12, 2009, because she did not follow the leave procedures. However, the

evidence shows that on October 22, Walker followed the leave procedure by

contacting Mr. Albritton, the designated acting supervisor. Although LeRoy claims

that Albritton did not have authority to approve leave, a jury could reject this claim

based on Walker's testimony. R.22, Ex.1 at No. 2 ("Mr. Albritton stated that he was

designated acting unit chief for that period and was not given any restrictions or

instructions regarding any of the employees within the unit.").

Similarly, LeRoy charged Walker as AWOL on February 12, 2009, even

though she did not violate his leave restriction letter.  He claims that she did not

follow the procedures for sick leave, however, she was requesting emergency leave

under the FMLA, not sick leave.  According to the leave restriction letter, when

she needed emergency leave, she need only "provide notice within a reasonable

27

period of time appropriate to the circumstances involved." R. 18, Ex.6 at 4.

LeRoy acknowledged that issues of AWOL in emergency circumstances are a

judgment call, R.22, Ex.9 at 95-96, but he charged Walker AWOL without

considering whether her voicemail and email notification was reasonable when she

found her mother soiled and disheveled in an apartment full of smoke.

### 2.     2008 Performance Rating.

Third, LeRoy claimed that his 2008 performance rating of Walker was low

because her unscheduled absences made it difficult to assign work to her and she

allegedly lacked interpersonal skills. R. 18, Ex.5 at 10. Yet, LeRoy failed to

identify a single situation or person to support his interpersonal skills' allegation or

to identify a single project that was not assigned to her due to her absences.

Further, DHS policy prohibited LeRoy from reducing Walker's rating based on her

taking approved leave. R.22, Ex.5 at 20 ("DHS management officials may not

lower the rating of record of an employee because of an approved absence from

work.").  Because LeRoy's rating depends upon his failure to follow the rule

prohibiting consideration of approved leave, a reasonable jury could conclude that

he is covering up a discriminatory or retaliatory motive. *See Evans v. Sebelius*,

716 F.3d 617, 620 (D.C. Cir. 2013) ("Employees may cast doubt on the employer's

proffered reason by, among other things, pointing to . . . the employer's failure to

follow established procedures or criteria") (quoting *Brady,* 520 F.3d at 495 n. 3).

### 3.    Letter of Reprimand.

LeRoy provided shifting accounts to support the official Letter of Reprimand. At first he alleged that Walker rudely "tossed" a leave slip. R. 18, Ex.10 at 1. Then, he claimed she "slammed" the slip on his desk and that all witnesses agreed she had "slammed" it.  Walker disputes this account, and no witness corroborated LeRoy's claim that she slammed anything. Then, more than four years after the incident, in his declaration to support summary judgment, he alleged that Walker spoke loudly during the incident. R. 18, Ex.2 at ¶ 11. He did not make this allegation in the Letter of Reprimand in 2009, R. 18, Ex.10, or at his deposition in 2012. R.22, Ex.9 at 108.  Furthermore, Walker was having an asthma attack at the time and she could barely talk.  A jury could conclude from the implausibility of LeRoy's explanation, along with his changing accounts of the incident at issue that he is dissembling to cover up an unlawful motive.  *See Geleta v. Gray*, 645 F.3d 408, 413-414 (D.C. Cir. 2011) ("shifting and inconsistent justifications are 'probative of pretext.'"); *Evans*, 716 F.3d at 620 ("Employees may cast doubt on the employer's proffered reason by, among other things, pointing to changes and inconsistencies in the stated reasons for the adverse action") (internal citations omitted).

The district court concluded that this letter of reprimand could not be shown to be based on Walker's race or protected activity because LeRoy himself did not

issue the letter.  R. 25 at 18, 26.  This holding is contrary to the law of this Circuit.

In *Griffin v.  Washington Convention Ctr*, this Court held that evidence of a

subordinate manager's bias is relevant if "the ultimate decisionmaker *is not*

*insulated from* the subordinate's influence." 142 F.3d 1308, 1309 (D.C. Cir. 1998)

(emphasis added).  More recently, in *George v. Leavitt*, this Court found that where

a manager "participated in and influenced [the] decision," that manager's motive

can supply the necessary evidence of discrimination to survive summary judgment.

*George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005). Only where a

decisionmaker reaches a decision independently from the alleged biases of other

supervisors are those supervisors' biases irrelevant.  *Hall v. Giant Food, Inc.*, 175

F.3d 1074, 1079-80 (D.C. Cir. 1999) (finding subordinate's motive irrelevant

because the decisionmaker made the decision independently -- without

recommendation or input from the biased subordinate).

　　　　For example, in *Griffin*, this Court held that an employee's bias was relevant

because the formal decisionmaker "depended upon [the alleged biased supervisor's]

observations and evaluation for most of his knowledge." 142 F.3d at 1311-12.

Similarly, in this case, the DAAP (Discipline and Adverse Actions Panel) relied

solely on LeRoy's biased version of the two incidents.  Indeed, the letter itself,

which appears to be authored by Mr. LeRoy, states:

　　　　　　DAAP gave careful consideration to the evidence supporting this

30

> action and have determined that a reprimand is warranted. The Panel
> also considered that you have no prior disciplinary record as well as
> other factors in imposing this reprimand including your length of
> service and your past performance.

R.18-3 at 68. Notably, the DAAP did not consider any evidence or explanation by

Ms. Walker. In fact, Ms. Walker was not even given an opportunity to present her

side of the story to the DAAP in writing or in person. Because the DAAP

considered only the evidence provided by Mr. LeRoy and no input from Walker

was permitted, a reasonable jury could conclude that LeRoy's retaliatory and/or

discriminatory bias influenced (at the very least) the decision to issue her a

reprimand; certainly, the decision cannot be said to have been "insulated from"

LeRoy's animus. *See Griffin*, 142 F.3d at 1311 (bias by a manager who may have

"infected any deliberations over whether to terminate Plaintiff supports an

inference of discrimination"). *Id.*

### 4.    Non-Selection.

Based on documentary evidence that Walker was referred for promotion to

the GS-13 level on the certificate with referral name "PH-09-JCS-05880S0," a

reasonable jury could conclude that LeRoy falsely claimed that Walker was not

referred to him for selection R.22, Ex.15 at 2-3. From the falsity of his

explanation, a jury could infer that LeRoy used the Grade 14 certificate so that he

could avoid selecting Walker. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147

(2000) ("the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").  Thus, summary judgment should be denied and the issue should be decided by a jury.

The district court improperly treated as dispositive Mr. LeRoy's statement[5] that he did not receive a certificate with Walker's name because ICE Human Resources decided to restrict the process to the Grade 14 eligible candidates. R. 25 at 21.  The court held that "[t]he OPM referral form demonstrates that Ms. Walker could have been referred to Mr. LeRoy if ICE Human Resources had looked beyond its GS-14 preference to fill the position with an *eligible* candidate, even if not a *preferred* candidate."  R. 25 at 21 (emphasis in original).  To the contrary, the OPM referral letter explicitly states that Ms. Walker was, in fact, referred to Mr. LeRoy for selection.  The form has her marked as "Status: R - Referred" for position: P-4-09-JCS-0588080."  R. 22-15 at 2-3.  To remove any doubt that

---

[5]The district court refers to "the Secretary's explanation that, while the vacancy announcement was a dual posting that could have been filled at the BS-13 or GS-14 level, ICE Human Resources required selection at the GS-14 level." R.25 at 21.  In fact, the "Secretary's" explanation is based exclusively on Mr. LeRoy's say-so; there is no testimony or documentary evidence from ICE Human Resources indicating that they restricted hiring to the GS-14 candidates.  In fact, the only evidence cited by the court is Mr. LeRoy's declaration and the GS-14 eligible list.  However, as noted above, the existence of the GS-14 eligible list in no way disproves the existence of a GS-13 eligibles' list and, in fact, Ms. Walker's letter from OPM raises an inference that there was such a list with Ms. Walker's name on it.  *See* R.18-4 at 51 (Exhibit 19) (GS-14 list of eligibles, asking selecting official whether the vacancy was filled by selection from an "OTHER CERTIFICATE OF ELIGIBLES (UC).").

"referred" means referred to the selecting official, the OPM form defines the status

code "R - referred" as follows:

> We have reviewed your application and found you qualified for the
> position listed above that have this Status code. *We have referred your*
> *name to the selecting official(s) for consideration*, and they will
> contact you if an interview is needed.

R.22-15 at 5 (emphasis supplied).  Surely, a jury can find from this evidence that

Human Resources referred Ms. Walker's name to the selecting official as indicated.

At the very least, this evidence creates a genuine issue of fact as to whether LeRoy

is telling the truth when he says that Walker was not referred to him on a list of

eligibles.

The district court also cites to the "Eligible List" as dispositive evidence that

ICE Human Resources restricted Mr. LeRoy's selection to GS-14 candidates,

refusing to credit the letter from OPM stating that Walker was referred to the

selecting official.  R. 25 at 20 (citing only LeRoy's declaration and the Eligible List

as evidence that "LeRoy only received approval to fill the position as the GS-14

level.").  However, a jury could reject LeRoy's claim that he was only given

approval for a GS-14 selection based on Walker's OPM letter stating that she was

referred as well as the Certificate of Eligibles itself.  The district court has credited

LeRoy's unsupported claim that the Certificate of Eligibles presented by the

Agency is the *only* Certificate he was given.  However, the survey at the end of the

33

Certificate asks the selecting official whether a selection was made from that

Certificate, and, if not, whether the vacancy was filled by selection from an

"OTHER CERTIFICATE OF ELIGIBLES (UC)."  R.18-4 at 51 (Exhibit 19).

Given the fact that Ms. Walker's OPM Referral Letter states that she was in fact

referred to the selecting official, a jury could reasonably conclude that there was

another Certificate of Eligibles on which Walker's name appeared and that LeRoy

concealed the Certificate with Walker's name to cover up his unlawful motive for

his rejection of her application and his mistreatment of her.

### C.    The District Court's Focus on a Prima Facie Case of Race Discrimination Was Error.

This Court has made clear that upon a motion for summary judgment, the

district court must resolve the central question of discrimination or retaliation *vel*

*non* and should <u>not</u> focus on the elements of a prima facie case.  Nowhere has this

been made more clear than in *Brady*, 520 F.3d at 494, where this Court stated:

> Much ink has been spilled regarding the proper contours of the prima-facie-case aspect of *McDonnell Douglas.* But as we read the Supreme Court precedents beginning with *Aikens,* the prima facie case is a largely unnecessary sideshow. It has not benefitted employees and employers; nor has it simplified or expedited court proceedings. In fact, it has done exactly the opposite, spawning enormous confusion and wasting litigant and judicial resources.
>
> Lest there be any lingering uncertainty, we state the rule clearly: In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not-

34

*and should not*-decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.

*Id.* Yet, the district court made exactly this error. In analyzing Walker's claim of race discrimination, the district court found that Ms. Walker did not establish a prima facie case separate and apart from her evidence of pretext. First, the court concludes that Ms. Walker's claim that her AWOL charges were discriminatory cannot be heard by a jury because "Walker offers no evidence linking Mr. LeRoy's strict adherence to the Leave Restriction Letter to her *race*."[6] R. 25 at 16 (emphasis in original). Then, the court held that Walker's claim that her Letter of Reprimand was discriminatory because "LeRoy's approval of intermittent FMLA

_____

[6]The district court held that Walker failed to show that her AWOL charges were motivated by her race, in part, because the white employee she compares herself to was not similarly subjected to Leave Restriction or allegations of being AWOL. R. 25 at 16-17. In addition to its error of engaging in an analysis of whether Ms. Walker had made out a prima facie case of race discrimination, the district court also turned the case law on its head. To the extent that comparator evidence may be offered as part of the body of evidence raising an inference of discrimination vel non, it is not necessary that the comparator "engaged in violations to the same extent to which [the plaintiff] is *alleged* to have committed infractions, [because] a reasonable jury could conclude that other employees engaged in violations to the same extent as [the plaintiff] *actually* did." *George*, 407 F.3d at 415. Because the question of whether LeRoy put Walker on leave restriction because she violated her FMLA leave (or because of her race or protected activity) is in genuine dispute, the white male employee who did not suffer leave restriction, AWOL charges, and a letter of reprimand may be reasonably compared to Walker to support a finding that LeRoy bore an unlawful animus against Walker. *See id.* (holding that the plaintiff could be deemed similarly situated to employees who had not committed violations to the same extent as the plaintiff is alleged to have committed because the extent of the plaintiff's violations were in dispute).

leave provides no support for her race discrimination claim based on his adherence to the Letter of Reprimand." R. 25 at 19.   This disaggregation of the evidence is error.

The court conducted a similar analysis of a prima facie case of retaliation. For example, the court noted that "[w]hile Mr. LeRoy's adherence to the Leave Restriction Letter might have been severe, it does not, standing alone, establish retaliatory intent."  R. 25 at 23.  However, this evidence does not stand alone and need not; it must be considered with other types of evidence to determine whether a reasonable jury could infer an unlawful motive.  *See Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (holding that a district court should consider "the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).").  Specifically, this Court has made clear that evidence of pretext may, alone or in combination with evidence such as a manger's harsh treatment of an employee, demonstrate a discriminatory motive.  *See Czekalski v. Peters,* 475 F.3d 360, 366 (D.C.Cir. 2007) ("[O]ne way for a plaintiff to show that an adverse employment decision was made for a discriminatory reason is to 'show[–] that the nondiscriminatory explanation the defendant proffered for its

36

decision was false.'").

Because, as detailed in the previous sections of this brief, there is sufficient evidence that LeRoy provided false explanations for his actions to support a finding of discriminatory and/or retaliatory motive, summary judgment must be reversed. *See Colbert v. Tapella*, 649 F.3d 756, 759 (D.C. Cir. 2011) (*quoting Aka*, 156 F.3d at 1293 (en banc)) ("The jury can conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory intent.").

## CONCLUSION

A reasonable jury could infer that Walker's EEO mediation and ongoing EEO activity was connected to LeRoy's actions against her because he began to antagonize Walker less than two months after he learned of and because he displayed contempt for her by (a) his incredible insensitivity to her need to use FMLA-approved leave for her mother; (b) falsely stating that the employee "slammed" a leave slip on his desk while she was having an asthma attack; (c) improperly lowering her evaluation based on her approved sick leave; (d) charging her AWOL and referring her for discipline for taking leave approved by her Acting Supervisor; and (e) charging her AWOL for failing to continuously make phone calls until she reached a live supervisor to request leave while she cleaned her disoriented and soiled mother in a smoke-filled apartment, even though she had left

a voicemail and sent an email during those emergency situations. Accordingly,

summary affirmance is inappropriate.


                              Respectfully Submitted,


                              _____/s/ Ellen K. Renaud_____
                              David H. Shapiro
                              Ellen K. Renaud
                              SWICK & SHAPIRO, P.C.
                              1101 15th Street, N.W.
                              Suite 205
                              Washington, DC 20005
                              Tel. 202-842-0300

                              Attorneys for Appellant

**CERTIFICATE OF COMPLIANCE**

The text for Appellant's Brief is prepared using Times New Roman, 14

point, and contains 9,622 words as counted by Corel Word Perfect.


         /s/ Ellen K. Renaud
         Ellen K. Renaud



**CERTIFICATE OF SERVICE**

I certify that a copy of this Appellant's Brief was served to Appellee's

counsel of record on October 17, 2014 by CM/ECF electronic notification.


         /s/ Ellen K. Renaud
         Ellen K. Renaud